UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ROBERT B. GOOD, JR., and DANIEL R. MILLER, individually and on behalf of all others similarly situated, | Case No. 06-CV-1027 (PJS/RLE) |
| Plaintiffs, | |
| v. | ORDER DENYING MOTION FOR CLASS CERTIFICATION |
| AMERIPRISE FINANCIAL, INC., f/k/a American Express Financial Corp.; and AMERIPRISE FINANCIAL SERVICES, INC., f/k/a American Express Financial Advisors, Inc., | |
| Defendants. | |

Barbara J. Felt, Samuel D. Heins, Dylan J. McFarland, and Lori A. Johnson, HEINS MILLS & OLSON, P.L.C., for plaintiffs.

Edward B. Magarian and Kimberly A. Fuhrman, DORSEY & WHITNEY L.L.P., for defendants.

Plaintiff Robert B. Good, Jr. is — and plaintiff Daniel R. Miller was — an independent

financial advisor affiliated with defendant Ameriprise Financial Services, Inc. ("Ameriprise"[1]).

Plaintiffs allege that Ameriprise failed to pay its financial advisors the full amount of the

commissions to which they were entitled under their contracts.  Plaintiffs bring this action on

behalf of a putative class of over 10,000 Ameriprise advisors, seeking damages for breach of

---

[1]Defendant Ameriprise Financial, Inc. is the parent company of Ameriprise Financial Services, Inc.  Plaintiffs have sued both entities — bringing identical claims against each — even though their contracts were with Ameriprise Financial Services, Inc., and not with Ameriprise Financial, Inc.  For purposes of the motions before the Court, however, Ameriprise Financial, Inc. does not dispute that plaintiffs may bring claims against it.  The Court will refer to the defendants collectively as "Ameriprise."

contract, breach of the duty of good faith and fair dealing, unjust enrichment, and conversion. Plaintiffs also seek declaratory relief under the Declaratory Judgment Act.

This matter is before the Court on plaintiffs' motion for class certification and Ameriprise's motion for judgment on the pleadings or, alternatively, summary judgment. For the reasons set forth below, plaintiffs' motion for class certification is denied. As further explained below, the denial of plaintiffs' motion for class certification raises two additional issues: First, given that the sole basis for federal jurisdiction over this case was the Class Action Fairness Act ("CAFA"), and given that the Court has determined that this case will not proceed as a class action, does the Court continue to have subject-matter jurisdiction over plaintiffs' individual claims? Second, if the Court continues to have subject-matter jurisdiction over plaintiffs' individual claims, must the Court order plaintiffs to arbitrate those claims?

Because the Court must decide these two threshold issues before addressing the merits of Ameriprise's motion for judgment on the pleadings or summary judgment, and because the parties have not briefed either of these issues, the Court will deny Ameriprise's motion without prejudice and ask the parties to submit supplemental briefing.

## I.  BACKGROUND

### A.  The Parties

Ameriprise employs or otherwise affiliates with thousands of financial advisors throughout the United States. Those advisors provide financial planning, products, and services to their clients. In March 2000, Ameriprise implemented a policy under which each advisor was required to choose one of three career platforms: "P1," "P2," or "P3." Those advisors electing the P1 platform became employees of Ameriprise. Those electing the P2 platform became

affiliated with Ameriprise as independent franchisees.  (P3 advisors are not involved in this litigation.)  The parties refer to March 22, 2000 — the date Ameriprise implemented this new policy — as "rollout."  Rollout is the beginning of the class period.

Good began working for Ameriprise in 1983 as an employee; later he became an independent contractor.  Good Dep. 38-39.  At the time of rollout, Good elected to become a P2 advisor.  He continues to be a franchisee of Ameriprise.  Miller began working for Ameriprise in 1998 as an independent contractor.  Miller Dep. 33.  At the time of rollout, Miller initially chose to become a P1 advisor, but, three months later, changed his mind and elected to become a P2 advisor.  Miller Dep. 11.  Miller ended his affiliation with Ameriprise in December 2005.  Miller Dep. 35.

### B.  Ameriprise's Compensation System

Before Ameriprise rolled out the new platform system in 2000, Ameriprise compensated its financial advisors through a complex system that was based on a variety of factors.  Since rollout, Ameriprise has compensated its financial advisors through a simplified system that is based primarily on what is known in the financial-services industry as Gross Dealer Concession or "GDC."

Generally speaking, when a financial advisor (such as Good) persuades a client to purchase a financial product (such as shares in a mutual fund), the vendor of that product (such as Fidelity) pays a commission to the broker-dealer with whom the financial advisor is affiliated (such as Ameriprise).  That commission is the GDC.  The GDC rate for any given product is disclosed in the prospectus issued by the vendor with respect to the particular product.  So if, for

example, the prospectus for a particular Fidelity fund discloses a GDC rate of 7%, and if a client

of Good invests $10,000 in that fund, then Fidelity would pay Ameriprise a GDC of $700.

Of course, Ameriprise must then pay Good.  Under the simplified compensation system

adopted at the time of rollout, Ameriprise pays an "advisor commission" to the advisor who

actually made the sale.  For most products, Ameriprise pays its P1 and P2 advisors a percentage

of the GDC.  This percentage is called the "payout rate."  Payout rates vary among advisors and

among products.  Since rollout, the payout rate for P1 advisors has ranged from 30% to 55%,

while the payout rate for P2 advisors has ranged from 74% to 91%.  Johnson Aff. Ex. E at 8,

Sept. 4, 2007 [Docket No. 74] ("Johnson Aff.").  To illustrate, using the example described

above:  If the GDC rate on Good's client's $10,000 investment in the Fidelity fund was 7%,

then, as explained, Ameriprise would receive a GDC of $700 from Fidelity.  If the payout rate

applicable to that investment was 85%, then Ameriprise would forward $595 of the GDC to

Good as his advisor commission and keep $105 for itself.  In the financial-services industry, the

portion of GDC retained by Ameriprise — that is, the $105 — is called the "haircut."

At issue in this case is the manner in which Ameriprise calculates the advisor

commission that it pays to P1 and P2 advisors on the sales of two particular types of financial

products:  Real Estate Investment Trusts (REITs) and Tax Credit Limited Partnerships (LPs).

For REITs and LPs, Ameriprise does not calculate the advisor commission based on the *full*

GDC.  Instead, Ameriprise skims a portion of the GDC off the top, then applies the payout rate

to what remains.  Typically, the vendor of an REIT or LP pays Ameriprise a GDC of 6% to 7%

of the sale price, but, in calculating the advisor commission, Ameriprise typically applies the

payout rate to an amount that represents 5% of the sale price.  To use the nomenclature of the

parties, Ameriprise takes a "double haircut":  Ameriprise takes the first haircut when it reduces the "base" from the actual GDC to the amount representing 5% of the sales price, and then it takes the second haircut when it applies the payout rate to this base.

To illustrate:  Suppose that a client of Good's invests $10,000 in a Hines REIT, and Hines pays a GDC rate of 7%.  Ameriprise would receive a GDC of $700.  In calculating the advisor commission to which Good is entitled, Ameriprise would take the first haircut by reducing the base to $500 (5% of the $10,000 investment), pocketing $200 for itself.  Ameriprise would then take the second haircut by applying the payout rate — say, 85% — to that $500 base. Ameriprise would forward $425 to Good, and pocket another $75 for itself.

Confusingly, Ameriprise calls the base — the $500 — the "GDC," even though, as plaintiffs correctly insist, the base is not what most people would consider the GDC.  "G" in "GDC" stands for "gross."  "Gross" means "[e]xclusive of deductions; total."  *American Heritage Dictionary of the English Language* 774 (4th ed. 2000).  The *gross* dealer concession is the $700 that Hines paid to Ameriprise.  The $500 that remains after the first haircut — the base to which Ameriprise applies the payout rate — is more accurately described as a *net* dealer concession.

### C.  The Contracts

The central question in this lawsuit is whether Ameriprise acted unlawfully in taking two haircuts on REITs and LPs.  Ameriprise contends that, under its contracts with its advisors, it was allowed to take two haircuts — that is, it was permitted to calculate the advisor commission for REITs and LPs by applying the payout rate to an amount that was less than the actual GDC. Plaintiffs disagree; they contend that Ameriprise was contractually bound to take only one

haircut — that is, to calculate advisor commissions by applying the payout rate to the actual

GDC for every type of product, including REITs and LPs.  Evaluating the merits of these

arguments is no easy task, as it requires identifying exactly which pieces of paper, which

electronically-stored or electronically-transmitted communications, and which oral statements

make up each advisor's "contract" with Ameriprise.

The parties agree that the formal contract signed by each advisor — specifically, the P1

employment agreement or the P2 franchise agreement — provides the foundation of that

advisor's overall contractual agreement with Ameriprise.  As noted, Good became a P2 advisor

in March 2000, and Miller became a P2 advisor several months later.[2]  Good and Miller signed

slightly different versions of the P2 franchise agreement, but both agreements include an

identical "Compensation" section.  This section does not contain any specifics about rates or

commissions, however.  In fact, this section does not even *mention* "GDC" or  "payout rate" or

"advisor commission."  Rather, this section incorporates something called a "Compensation

Schedule," which is supposed to be found in something called "Manuals":

> Compensation.  As long as this Agreement is in effect . . .
> [Ameriprise] agrees to . . . pay to Independent Advisor . . . the
> balance of the Compensation for each Accounting Period . . . .
>
> As used in this Agreement, "Compensation" which is further
> defined in the Manuals, is the compensation from a product sale as
> specified in the Compensation Schedule, based on what Products
> & Services the Advisor sells. . . .

---

[2]Miller was a P1 advisor for about a three-month period, but he did not sell any REITs or
LPs during that period, so the P1 agreement that he signed is not directly relevant to the claims
that he is pursuing in this action.  Miller Dep. 11.  That agreement will nevertheless be described
below, as Good and Miller are seeking to represent a putative class that includes P1 advisors.

> Disclaimer of Benefits.  Independent Advisor acknowledges that
> the Manuals, including the Compensation Schedule contained
> therein, constitute the complete list of the compensation and
> benefits owed Independent Advisor resulting from this Agreement
> or Independent Advisor's relationship with [Ameriprise].

Fuhrman Aff. Ex. B1 § 4, Aug. 7, 2007 [Docket No. 69] ("Fuhrman Aff."); *id.* Ex. C1 § 4.  The

"Manuals" to which the agreement refers are defined as the "Confidential Operations Manuals,"

which, in turn, are defined to include "manuals, bulletins, and other written policies and

procedures . . . ."  Fuhrman Aff. Ex. B1 § 9; *id.* Ex. C1 § 9.  In short, the agreement obligates

Ameriprise to pay its franchisee advisors pursuant to any "Compensation Schedule" found in any

"Manual,"[3] except to the extent that any "Manual" provides otherwise.

Similarly, the P1 agreement that Miller initially signed — and that was presumably

signed by many other members of the putative class — does not contain any specifics about

compensation.  Instead, it provides as follows:

---

[3]Further complicating an already complicated case, there is in fact nothing in the record
bearing the title "Compensation Schedule."  After noting this fact, the parties proceed to anoint a
variety of documents in the record with various names that they contend are the actual working
title of the "Compensation Schedule," including "Platform 1 and 2 Compensation Guide,"
"Compensation Reference Guide," and "Compensation Manual."  This imprecise nomenclature
is partly a result of the parties' substantive dispute over what documents compose the Manuals
that are incorporated into the franchise agreements.

The Court notes, however, that "schedule" has a narrower meaning, in this context, than
"guide" or "manual."  A "schedule" is "[a] printed or written list of items in tabular form" or "[a]
supplemental statement of details appended to a document."  *American Heritage Dictionary of
the English Language* 1557 (4th ed. 2000).  Thus, when the franchise agreement refers to the
"Compensation Schedule," it is not necessarily referring to every word that appears in a Manual
— that is, every word that appears in a manual, bulletin, or other written policy or procedure.  To
be precise, therefore, the Court will use "Compensation Schedule" to refer to the actual
numerical rates that Ameriprise published in a Manual and used to calculate the "GDC," and the
Court will use "Manuals" to refer generally to the group of documents allegedly incorporated
into the franchise agreements.

You will be provided compensation in accordance with the rules and policies established by the Company and in accordance with applicable law.  You understand the Company may in its sole discretion amend or modify its compensation policies or plans from time to time.  Any compensation paid will constitute payment in full for all services rendered to the Company. . . .

Except for clerical error and undisclosed material facts, the regular compensation statement Company issues to you is considered to be an accurate and complete record of all the amounts Company owes you.  Settlement on the basis of these regular statements constitutes full satisfaction and agreement between you and Company about the amounts defined just above.  The only exceptions occur in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

Fuhrman Aff. Ex. D at AMP024214.  According to plaintiffs, the reference to "rules and policies established by the Company" includes all the same documents incorporated into the P2 agreement — that is, all of the documents that make up the Manuals.

Obviously, then, the first place one would look to determine Ameriprise's obligations with respect to advisor compensation would be the Manuals, and specifically the Compensation Schedule found in those Manuals.  But determining what, exactly, is in the Manuals is very difficult.  First, plaintiffs apparently never received a printed version of any Manual.  Instead, Ameriprise provided its financial advisors with electronic access to online versions of the Manuals.  Fuhrman Aff. Ex. B1 § 9; *id.* Ex. C1 § 9.  Second, Ameriprise retained the right to revise the Manuals, and it exercised its right regularly throughout the class period.  Thus the contents of the Manuals might vary from one day to another.  Recall, too, that "Manuals" was defined to include not only "manuals," but any "bulletin[]" or "other written polic[y] or procedure[]."  Fuhrman Aff. Ex. B1 § 9; *id.* Ex. C1 § 9.  During the class period, Ameriprise regularly distributed various bulletins and written policies and procedures — almost always

-8-

electronically.  And, again, Ameriprise retained the right to modify those documents, and it

exercised that right from time to time.

Notwithstanding the fact that the precise contents of the Manuals was a moving target —

and notwithstanding the fact that it would be difficult to pin down the precise contents of the

Manuals for any particular day — the parties generally agree that the Compensation Schedules

set forth in the Manuals identified the rates that Ameriprise used to determine what it considered

to be the "GDC" for all products.  *See, e.g.*, Fuhrman Supp. Aff. Ex. D(2), Sept. 10, 2007

[Docket No. 78] ("Fuhrman Supp. Aff.") (setting forth rates for a CNL Hospitality Properties

Inc. REIT).  For all products save REITs and LPs, the rate listed on the applicable Compensation

Schedule was, in fact, the "real" GDC rate.  If, for example, the vendor of a particular product

paid a concession of 7% to Ameriprise, the schedule identified 7% as the GDC rate.  For REITs

and LPs, though, the rate on the schedule was lower than the "real" GDC rate.  If, for example,

the vendor of an REIT paid a GDC rate of 7% to Ameriprise, the schedule might identify 5% as

the "GDC rate" or as the rate that Ameriprise would apply in determining the "GDC."

Importantly, plaintiffs do not contend that Ameriprise has failed to pay them in

accordance with the rates set forth in the Compensation Schedules.  In other words, there is no

dispute that, every time any class member sold an REIT or an LP, Ameriprise calculated what it

called the "GDC" by multiplying the amount that the client paid the vendor for the product by

the rate set forth in the Compensation Schedule for that product, and then multiplying the result

by the applicable payout rate.  Nor do plaintiffs contend that any language in the P1 employment

agreement, the P2 franchise agreement, or any Compensation Schedule precluded Ameriprise

from calculating advisor commissions in this manner.  In fact, in response to the Court's request

that plaintiffs identify all of the contractual language on which they rely, plaintiffs produced a chart that does not cite *any* language from a P1 agreement, a P2 agreement, or a Compensation Schedule. *See* Felt Aff. Ex. A § B, Oct. 5, 2007 [Docket No. 83] ("Felt Aff."). In short, if one looks only at the P1 agreement, the P2 agreement, and the Compensation Schedules, Ameriprise committed only to pay compensation according to the applicable Compensation Schedule, and there is no dispute that Ameriprise honored that commitment: It paid compensation according to the applicable Compensation Schedule. At first glance, then, it appears that plaintiffs will have a difficult time prevailing against Ameriprise.

Plaintiffs argue, however, that Ameriprise was contractually obligated to compute their commissions by applying the payout rate to the *real* GDC — that is, to the total amount that the vendor paid Ameriprise. According to plaintiffs, Ameriprise breached this contractual obligation with respect to REITs and LPs because multiplying the client's investment by the rate listed on the Compensation Schedule did not produce the real GDC, but instead produced an amount that was less than the real GDC. To overcome the fact that nothing in the P1 or P2 agreements or in any Compensation Schedule required Ameriprise to apply the payout rate to real GDC, plaintiffs cite three documents that, they allege, contain (or at least provide evidence of) Ameriprise's contractual commitment to do just that: (1) the "Platform Resource Kit," which Ameriprise distributed to its existing advisors in 1999 during the transition to the new three-tiered career track; (2) a December 1, 1999 presentation entitled "Understanding advisor income in the Platform world," in which Ameriprise provided information about the new GDC-based compensation system; and (3) a single-page printout from the "Platform 1 and 2 Compensation

Guide" entitled "How does GDC work?"  *See* Felt Aff. Ex. A § B (chart detailing contractual language on which plaintiffs rely).[4]

There is no language in any of these documents that unambiguously commits Ameriprise to calculate the advisor commission on every product by applying the payout rate directly to real GDC.  To the contrary, these documents are unclear on the subject of advisor compensation. The documents are consistent in suggesting that advisor commissions will be calculated by applying the payout rate to something that *Ameriprise* calls the "GDC."  But the documents are not clear about how Ameriprise *defines* "GDC."  In some instances, the documents define "GDC" as the real GDC — that is, as the total concession that a vendor pays Ameriprise on the sale of the vendor's products.  In other instances, the documents define "GDC" as simply the product of a mathematical equation — the amount that the client paid to the vendor for the product multiplied by the rate for that product listed in a Compensation Schedule or appendix.

To illustrate:  In a section entitled "General Overview," the Platform Resource Kit explains GDC as follows:

---

[4]Plaintiffs also cite a form hiring letter, dated September 2001, intended for new P1 advisors.  But that letter contains no language that could be construed as a promise to apply the payout rate to actual GDC on every sale of every product.  *See* Felt Aff. Ex. F.  Even if it did, of course, the letter would only be relevant to the claims of those class members who were (1) hired as P1 advisors (not P2 advisors); (2) received this particular hiring letter; and (3) sold REITs or LPs as a P1 advisor.  Neither Good nor Miller would be included among those class members.

| | |
|---|---|
| What is Gross Dealer Concession? | . . . .  Now, the basis for our compensation programs will be gross dealer concession (GDC).  GDC is a more common method of pay in the industry.  It is commonly associated with the sales of securities or variable products.  At [Ameriprise] we will use GDC as a method of pay for all our products and services, including insurance and fixed products. |
| | Simply put, GDC is money (concession) paid by the product manufacturer (vendor) to the distributor (broker dealer).  The representative (advisor) making the sale receives a percentage of the concession (payout). |
| How Does GDC Work? | Typically in the financial services industry the product manufacturer keeps a portion of the client fee or load, then passes on the rest to the broker/dealer organization.  This is the gross dealer concession.  The broker then retains a portion of the GDC and passes on the rest to the sales representative.  This is the payout, which is a percentage of the GDC. . . . . |

Fuhrman Aff. Ex. A1 at 4 (the "Kit").[5]  In another section, the Kit explains the "haircut:"

| | |
|---|---|
| What is the haircut on financial planning fees in Platform 2? | Each dollar of fees generates one dollar of GDC.  The haircut on most fees is the standard 15 percent, except for FAS Plus services. |

Johnson Aff. Ex. I at 6.

Elsewhere, however, the Kit implies that Ameriprise defines "GDC" simply as the

product of the sale price multiplied by whatever "GDC rate" Ameriprise lists for that product.

For example, the Platform Resource Kit states that the "GDC rate or product GDC rate" is "the

rate (typically a percentage of the client load or fee) that is applied to a product sale to generate

the GDC or concession on a sale."  Kit 5.  The Kit then states that "gross dealer concession

---

[5]The Kit submitted as Exhibit A1 to the August 7, 2007 Fuhrman affidavit is dated April 20, 2000.  Good testified, however, that it is substantively the same as the Kit he received pre-rollout.  Good Dep. 194-95.

-12-

rates" for each product are the rates that are listed in an appendix.  Kit 5.  The appendix contains the actual rates that Ameriprise applied to determine "GDC," including rates for two REITs. Kit 27.  Ameriprise contends that, because the actual vendor-concession rate — the *real* GDC rate, in other words — is disclosed in vendor prospectuses, and because advisors were required to read the prospectuses before selling the relevant products, advisors knew or at least should have known that what Ameriprise labeled as the "GDC rate" for REITs and LPs was not the real GDC rate.  Indeed, at his deposition, Miller conceded that "the fact that Ameriprise is paying out something less than the percent that they were receiving from the vendor is not being hidden from the advisors in [the] Platform Resource Kit[.]" Miller Dep. 168.

The other documents on which plaintiffs rely are similarly ambiguous.  In the December 1, 1999 presentation entitled "Understanding advisor income in the Platform world," Ameriprise states that "[t]he GDC (or concession) is what is generated after the GDC rate is applied to the product sale.  The GDC payout is your 'cut' of the GDC."  Felt Aff. Ex. C at 9.  At the same time, Ameriprise also warns advisors that "you have to look [the GDC rate] up on the Product GDC schedule" in order to calculate GDC.[6]  Felt Aff. Ex. C at 9.  On the Product GDC schedule, of course, the "GDC rate" listed for REITs and LPs is less than the rate that was applied by the vendor in calculating Ameriprise's concession.  Similarly, the third document plaintiffs cite — the "Platform 1 and 2 Compensation Guide" — states both that GDC is the portion of the "client fee or load" that the vendor "passes . . . to the broker/dealer organization"

---

[6]Presumably, the "Product GDC schedule" is the same thing as the "Compensation Schedule."  In any event, there is no allegation that Ameriprise failed to use the rates set forth in anything entitled the "Product GDC schedule."

*and* defines GDC as "the amount generated after the GDC rate is applied to the product sale." Johnson Aff. Ex. N.  In the case of REITs and LPs, those are not the same.

Certainly, Ameriprise can argue that, just as parties to a contract can agree to define "up" to mean "down" or "black" to mean "white," Ameriprise could define "GDC" in whatever manner it wished.  Ameriprise will no doubt argue that the contractual provisions committing Ameriprise to paying compensation in accordance with specific formulas control over general discussions of GDC and GDC-based compensation.  In response, plaintiffs will no doubt argue that language in contracts is to be given its ordinary meaning, and that "gross dealer concession" cannot mean anything other than the gross concession paid to the dealer (Ameriprise) by vendors.  Plaintiffs can also argue that "gross dealer concession" has a recognized meaning in the financial-services industry — a meaning that Ameriprise intended to invoke when it informed its advisors that it would be moving to a "GDC-based" compensation system. Assuming that the statements in the Kit and similar documents are a part of the contracts between Ameriprise and its advisors, then, the ambiguity in those contracts would have to be resolved by a jury.

The parties dispute, however, whether the statements in these documents — in particular, the statements in the Kit — are, in fact, part of any contract between Ameriprise and an advisor.[7] Ameriprise argues that they are not, and, at first blush, it would appear that Ameriprise is correct,

---

[7]Plaintiffs do not appear to consider the December 1, 1999 presentation a part of the contracts.  Although Ameriprise argues that the excerpt plaintiffs cite from the "Platform 1 and 2 Compensation Guide" is not a "Compensation Schedule," it would be hard for Ameriprise to dispute that the document is a part of the parties' contracts, given that Ameriprise contends that other documents with the same title are incorporated in contracts.  *See, e.g.*, Fuhrman Supp. Aff. Ex. D(4) (a portion of what Ameriprise calls the "Compensation Manual" with the heading "Platform 1 and 2 Compensation Guide").

at least with respect to the Kit. Both the P1 employment agreement and the P2 franchise

agreement are integrated contracts, and the Kit has a disclaimer stating that it does not create any

contractual rights. Fuhrman Aff. Ex. B1 § 24; *id.* Ex. C1 § 24 (P2 integration clauses); *id.* Ex. D

at AMP024215 (P1 integration clause); Kit 2 (disclaimer). According to plaintiffs, however,

(1) the P1 and P2 agreements incorporate the Manuals; (2) the Manuals incorporate "platform

communications," according to something called the "Franchise Navigation Guide," which

Ameriprise distributed to advisors in November 1999; and (3) "platform communications"

include the Kit. *See* Johnson Aff. Ex. F at P001819 (the "Franchise Navigation Guide" section

stating that "[t]he existing manuals plus the platform communications currently define the

manuals").

The difficulty of determining the content of the parties' contracts is further compounded

by the fact that Ameriprise clearly reserved the right to modify the contracts, and Ameriprise

eventually did disclose the double haircut in documents that arguably became part of the parties'

contracts. Ameriprise, of course, would now have the Court believe that it has been clear since

rollout that Ameriprise considered "GDC" to sometimes mean something other than GDC. But

there is evidence in the record that Ameriprise itself thought that its practice of taking a double

haircut on REITs and LPs bordered on deceptive. *See, e.g.*, Johnson Aff. Ex. A at AMP089379

(e-mail stating that "I am running out of things to lead [advisors] around this issue. . . . At a

minimum we did mislead advisors on these GDCs. I did not know about the double dip until

they brought it to my attention. I am sure if we all understood it at [rollout] we would have

explained the comp program differently.").

Whether or not advisors *should* have realized that Ameriprise was taking a double haircut on REITs and LPs — as explained above, any advisor could have discovered this fact by reading the prospectus for an REIT or LP and comparing the "real" GDC rate to the "Ameriprise" GDC rate — many of them were clearly in the dark.  As advisors became aware of the double haircut, many of them protested.  *See, e.g.*, Johnson Aff. Ex. A.  Presumably in response to these protests, Ameriprise decided to disclose the rationale behind its double haircut in June 2003.  Even then, though, the company buried the explanation in a bulletin that was ostensibly about distribution reinvestment plans ("DRIPs") that were available to clients with direct investments, such as REITs and LPs.  *See* Fuhrman Aff. Ex. E.  After a page and a half of description of the benefits of DRIPs — under which clients elect to have their dividends reinvested in the product — the bulletin sets out both the "GDC" rates and the "general partner commission" rates on dividends reinvested by clients pursuant to DRIPs.  Fuhrman Aff. Ex. E.  The bulletin then explains that "[t]he GDC rate is set lower than the commission amount received from [the vendors] . . . ."  Fuhrman Aff. Ex. E.  Ameriprise contends that, whether or not advisors might earlier have had some right to compensation based on the entire GDC,  this disclosure clearly put an end to any such right.  But the limited context of this disclosure makes it likely that at least some Ameriprise financial advisors interpreted this bulletin to apply only to dividends reinvested in particular products via DRIPs, and not to *all* investments in REITs and LPs.

Following the June 2003 disclosure, Ameriprise made further efforts to disclose the difference between the real GDC on REITs and LPs and the "base" to which Ameriprise was applying the payout rate.  *See, e.g.*, Fuhrman Aff. Ex. H (April 2004 bulletin listing revised "GDC" rates for certain REITs alongside vendor "selling commission rates"); *id.* Ex. I (May

2004 posting in the online "Platform 1 and 2 Compensation Guide" stating Ameriprise's justification for the double haircut); *id.* Ex. J (similar information posted in September 2003). The parties dispute whether the June 2003 communication and later bulletins represent a change in their contracts, and whether, if they do represent a change, Ameriprise gave the notice that plaintiffs contend is required under their contracts.  At a minimum, however, there does not appear to be any serious dispute that these bulletins would have been incorporated into any contracts signed *after* these bulletins were issued.

### D.  Procedural Background

Plaintiffs filed this case in March 2006.  Shortly thereafter, Ameriprise filed a motion to compel plaintiffs to arbitrate their claims or, in the alternative, to dismiss those claims.  Both the P1 and P2 contracts contain clear arbitration clauses, but the Court nevertheless denied Ameriprise's motion on the basis of a rule promulgated by the National Association of Securities Dealers ("NASD"), of which Ameriprise is a member.  That rule prohibits dealers from seeking to enforce arbitration agreements with respect to claims that are part of a class action until class certification is denied, the class is decertified, or the individual against whom arbitration is sought is otherwise excluded from the class.  *See* Docket No. 45.

Plaintiffs now move for class certification.  Ameriprise resists the motion and moves for judgment on the pleadings or, alternatively, summary judgment.  Because it appears to the Court that its jurisdiction may depend on the outcome of plaintiffs' motion for class certification, the Court will address that motion first.

### II.  CLASS CERTIFICATION

Plaintiffs seek to represent a class defined as follows:

> All persons who sold shares of Real Estate Investment Trusts
> (REITs) and/or tax credit Limited Partnerships (LPs), as branded
> advisors (Platform 1 and Platform 2 Advisors) for Defendants
> between March 22, 2000 and the present.

Compl. ¶ 12.

For a class to be certified, plaintiffs must meet all of the criteria of Rule 23(a) and fall

within one of the categories of Rule 23(b).  Plaintiffs bear the burden of showing that the class

should be certified and that the requirements of Rule 23 are met.  *Coleman v. Watt*, 40 F.3d 255,

258 (8th Cir. 1994).  District judges — who, after all, will have to manage a class action if it is

certified — have wide discretion in determining whether certification of a class is appropriate.

*Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980).

### A.  Rule 23(a)

Rule 23(a) requires that the following must be established before a class may be certified:

> (1) the class is so numerous that joinder of all members is
> impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical
> of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the
> interests of the class.

Fed. R. Civ. P. 23(a).  The Court need not address all four of these prerequisites, however,

because plaintiffs clearly do not meet the second requirement — that there be a question of law

or fact common to every member of the class.

Rule 23(a)(2) does not require that every question of law or fact be common to every

member of the class.  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982).  At the

same time, not every common question of law or fact will suffice to meet the commonality requirement.  In any putative class action, the plaintiffs share in common the ultimate question, such as "Is the defendant liable to the plaintiffs for breach of contract?"  But that does not mean that every putative class action meets the commonality requirement.  In order to determine whether there is truly a common question of law or fact for purposes of Rule 23(a)(2), a court must dig deeper and identify the legal and factual issues on which the ultimate question will turn. There must be a *consequential* question of law or fact that applies to every single member of the class and that can be answered the same way with respect to every single member of the class. As the Sixth Circuit explained:

> [A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation.

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

The main focus of plaintiffs' case is their breach-of-contract claim.[8]  Plaintiffs identify what they allege are numerous common issues of law and fact, but those issues essentially boil down to a single question:  Is Ameriprise contractually obligated to calculate advisor commissions on the sale of REITs and LPs by applying payout rates directly to GDCs?  *See* Pls.' Reply Mem. Supp. Mot. Class Cert. 3.  That, of course, is the ultimate question in this litigation, and thus, in the abstract, it is obviously common to every member of the class.  But to answer

---

[8]Plaintiffs bring two contract claims: a claim for breach of contract, and a claim for breach of the implied duty of good faith and fair dealing.  Plaintiffs concede that P1 advisors, who are employees, cannot bring a good-faith claim.  *See Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986) (under Minnesota law, there is no implied duty of good faith and fair dealing in employment contracts).

that question, the Court must identify what exactly are Ameriprise's contractual obligations with respect to each class member. And therein lies the rub: There is no one contract that is applicable to every member of the class.

As described above, although Ameriprise was obligated to pay advisors according to what was in the Manuals, the Manuals were not a single set of documents that applied to all putative class members throughout the entire class period. Indeed, the Manuals were not even a series of documents whose applicability at any given time can readily be determined — i.e., "Original Version" applying to all class members from March 22, 2000, to September 30, 2001, "First Revised Version" applying to all class members from October 1, 2001 to April 15, 2003, and so on. Rather, what was in the Manuals could change from day to day — even from hour to hour — as Ameriprise announced a new policy, or a revision to an existing policy, or a new product, or a revision to an existing product.

Thus, a putative class member who signed on with Ameriprise at the time of rollout would have a different contract than a putative class member who signed on with Ameriprise in 2002. A putative class member who signed on with Ameriprise in 2002 would have a different contract than a putative class member who signed on with Ameriprise in 2004. A putative class member who signed on with Ameriprise on March 1, 2003, would have a different contract than a putative class member who signed on with Ameriprise on June 1, 2003. And a putative class member who signed on with Ameriprise in 2002 and remains affiliated with the company would have a different contract than a putative class member who signed on with Ameriprise in 2002 and left in 2004. Adjudicating this putative class action would literally require the Court to identify the contents of 10,000 contracts.

This might not be an insurmountable barrier if plaintiffs were asking the Court to interpret a single provision that appeared, without change, in all 10,000 of those contracts. Similarly, class certification might be warranted if it were possible to group the contracts by type into a reasonable number of subclasses. And it is certainly true, as plaintiffs argue, that the compensation provisions in the P1 employment agreement and the P2 franchise agreement have not changed over time.

The problem is that plaintiffs' theory of the case does not turn on the meaning of any term in the P1 or P2 agreements. To the contrary, as noted above, plaintiffs cannot point to a single word in any P1 employment agreement, P2 franchise agreement, or Compensation Schedule that compels Ameriprise to calculate the advisor commission by applying the payout rate to the GDC. Rather, plaintiffs rely on general discussions of GDC that appear in various documents that were distributed at various times to various members of the class. Ameriprise, in turn, defends on the basis of discussions of GDC that appear in various other documents that were distributed at various other times to various other members of the class. As to each portion of each discussion, the parties contest whether it became part of *any* contract — and, if so, what contracts and when. And, of course, because most of the language in these discussions was ambiguous, the parties also contest what the language meant.

To cite just one example: Plaintiffs rely heavily on the Platform Resource Kit as the source of Ameriprise's contractual commitment to calculate commissions as a percentage of GDC. But the Kit states that it creates no contractual rights. To bootstrap the Kit into the contract, plaintiffs rely on the Franchise Navigation Guide. But Ameriprise distributed both the Kit and the Guide to its existing advisors in 1999, and there is no evidence that either the Kit or

the Guide were regularly distributed to advisors who joined Ameriprise after rollout.[9]  Every

contract signed by a class member took effect after these documents were distributed, and every

one of those contracts contains an integration clause.  To draw the conclusion that plaintiffs

advocate — that contrary to the clear language of both the contracts and the Kit itself, the Kit is

nevertheless part of every class member's contract — the Court would have to examine

individualized evidence concerning the circumstances under which each class member entered

into his or her contract.

Even assuming that the Kit (and similar documents) are a part of the contracts, there is

still no single unambiguous — or even ambiguous — contract provision for the Court to

construe.  It is black-letter law that contractual provisions must be read not in isolation, but in the

context of the entire contract.  *Country Club Oil Co. v. Lee*, 58 N.W.2d 247, 249 (Minn. 1953);

*Nichols v. Metro. Bank*, 468 N.W.2d 84, 86 (Minn. Ct. App. 1991).  This case demonstrates the

wisdom of that principle.  Certain clauses in the documents cited by plaintiffs, when read in

isolation, clearly define GDC as the amount that Ameriprise is paid by the vendor.  Other clauses

in the same documents, when read in isolation, just as clearly define GDC as the product of

multiplying the amount of the customer's investment by a particular rate set forth in a schedule.

When the documents are read as a whole, however, they are ambiguous, precisely because they

define GDC in inconsistent ways.  And because these documents are ambiguous, a judge or jury

---

[9]Plaintiffs offer a September 2002 e-mail attaching a chapter of the Kit as evidence that
Ameriprise continued to distribute the Kit to new advisors.  But there is no evidence indicating
that the person to whom the Kit was sent in September 2002 was an advisor, much less an
advisor who joined Ameriprise after March 2000.  Nor is there anything in the e-mail suggesting
that the Kit was regularly sent to new advisors.

would have to consider extrinsic evidence in determining their meaning.  *See Hous. & Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005).

And that raises another problem:  To this point, the Court has discussed only the *written* evidence.  But written evidence would be only one focus of the trial — perhaps not even the major focus.  Both parties would introduce considerable extrinsic evidence, including evidence of oral statements made by various people at various times to various members of the class.  The parties would seek to introduce this evidence on issues of contract formation and meaning, and on Ameriprise's non-frivolous defenses, such as its defenses of waiver and estoppel.

For example, Good testified that he was aware of Ameriprise's justifications for the double haircut before rollout.  Good Dep. 182-85.  Certainly, that evidence, which is particular to Good, is highly relevant extrinsic evidence of contractual intent — and highly relevant to Ameriprise's waiver and estoppel defenses.  Plaintiffs argue that Good's testimony does not mean what it appears to mean, but that, of course, would be for a jury to decide.  And that would be only one decision that the jury would have to make with respect to only one class member.

Other portions of Good's testimony indicate that class members' awareness of the double haircut is likely to be a significant issue, at least with respect to class members who signed contracts after rollout.  Good unequivocally testified that he knew that all of his commissions were not being calculated on full GDCs after he received the Compensation Manual (apparently shortly after rollout).  Good Dep. 164 (Good began discussing the issue of Ameriprise's failure to pay on the full GDC for all products "almost immediately when the platform was rolled out").  The fact that Good knew "almost immediately when the platform was rolled out" that not all of his compensation was calculated as a percentage of GDC at least raises the possibility that other

class members who signed contracts *after* rollout had similar knowledge at the time they signed their contracts.

Yet another example of extrinsic evidence that is not relevant to all, or even most, of the class members' claims is the December 1, 1999 Ameriprise presentation concerning advisor compensation. Plaintiffs offer this presentation in support of their claims, but there is no evidence connecting this presentation to them, much less to any other class member. Given the timing and purpose of that presentation, there is no reason to suppose that it has any relevance to the claims of class members who signed contracts at any time after rollout. For that presentation to be relevant evidence of the meaning of any particular class member's contract, there would have to be individualized proof connecting the presentation to the class member.

There is yet another problem. As described above, the contents of the Manuals — and thus the nature of Ameriprise's contractual obligations — were a moving target. Throughout the class period, Ameriprise continuously revised its Manuals and issued bulletins and other company communications affecting the contracts. (For example, beginning in June 2003, Ameriprise began disclosing the double haircut in documents that are arguably part of plaintiffs' contracts and almost certainly part of any contracts signed after June 2003.) Each class member therefore did not have one contract that remained static throughout his or her affiliation with Ameriprise. Rather, each class member had many contracts, as a new contract was created (at least arguably) every time Ameriprise revised a provision of one of the Manuals or issued a new bulletin. Thus, if the putative class is made up of 10,000 members, the Court may have to identify and interpret not 10,000 contracts, but many times that number.

This raises yet another complication.  It is entirely possible that, with respect to some members of the putative class, Ameriprise will be required to pay damages related to some sales of REITs or LPs but not others.  For example, Ameriprise might successfully argue that, with respect to a particular class member, it breached his or her contract only up to a particular date, when that contract was amended.  Or Ameriprise might argue, with respect to a particular class member, that it breached his or her contract, but that the class member waived his or her right to seek damages for the breach after being told a particular fact in a particular conversation on a particular date.  Thus, with respect to each of 10,000 class members, the Court would have to identify the timing of each sale of an REIT or LP, the constellation of contractual terms that were in effect at that time, and whether, prior to that time, anything had happened that would support a waiver or estoppel or other defense.

Aside from the problems inherent in determining the content of each class member's contract, there is the additional problem that plaintiffs seek to represent both P1 and P2 advisors.  The contracts for P1 advisors are completely different from those for P2 advisors.  One of the ways the contracts differ is that P1 contracts limit the time in which P1 advisors can challenge their compensation.  The limitations clause contains some exceptions, including an exception for "undisclosed material facts."  Plaintiffs claim that P1 class members' claims come within this exception, but this is plainly an issue that would have to be litigated class member by class member.

Clearly, then, plaintiffs' main claims — that Ameriprise breached their contracts — do not present a question of law or fact that is common to every single member of the putative class.  Plaintiffs bring other claims as well — for unjust enrichment and conversion — but these claims

are even less suited for class adjudication.[10]  To begin with, although plaintiffs seek to certify a nationwide class of over 10,000 advisors, they assume that Minnesota law applies to every class member's claims.  *See* Pls.' Mem. Opp. Summ. J. 39-41 (citing Minnesota law).  But plaintiffs have not conducted any choice-of-law analysis, and they do not even attempt to explain why it would comport with due process and the Full Faith and Credit clause to apply Minnesota law to a nationwide class.  *Cf. In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005).  Without knowing what law applies, it is impossible to say that there are questions of law common to the class.

Even assuming that it is proper to apply Minnesota law to plaintiffs' claims for unjust enrichment and conversion, it is apparent that these claims are not suited for class treatment.  The factual basis of these claims overlaps substantially with the factual basis of plaintiffs' contract claims.  Plaintiffs contend that there are additional facts relevant to their unjust enrichment and conversion claims.  It is hard to imagine, though, that these additional facts could be common to the class, and plaintiffs have not provided any specific examples demonstrating otherwise.

The bottom line is that, while there are undoubtedly many questions of law and fact that are common to *many* members of the putative class, there is no single question of law or fact — at least any question of consequence — that is common to *every* member of the putative class.  Plaintiffs have thus failed to meet the commonality requirement of Rule 23(a) with respect to any of their claims.

---

[10]Plaintiffs' remaining claim simply seeks declaratory relief in connection with plaintiffs' substantive claims.

### B. Rule 23(b)

Plaintiffs seek class certification under Rule 23(b)(3), which provides that a class action

may be maintained if

> the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy.
> The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Even if plaintiffs met all of the prerequisites of Rule 23(a), class certification would not be

appropriate under Rule 23(b)(3).[11]

For all of the reasons described above, this case is not manageable as a class action.  To

litigate this case, a court would have to begin by identifying the date of every sale of an REIT or

LP by every plaintiff.  The Court would then have to identify, with respect to each sale by each

plaintiff, which patchwork of ever-changing contractual terms was in effect for that plaintiff on

that date.  In making this determination, the Court would have to consider both intrinsic and

extrinsic evidence that was unique to the plaintiff, such as evidence about what documents the

---

[11]Plaintiffs also contend, without elaboration, in a footnote, that class certification would
be appropriate under Rule 23(b)(2).  Plaintiffs' contention appears meritless, and thus the Court
will reject it, without elaboration, in this footnote.

plaintiff had read and when, and evidence about what conversations the plaintiff had engaged in and when.  And then, if the Court found a breach with respect to a particular sale, the Court would have to turn to whatever defenses Ameriprise had asserted with respect to that plaintiff.  This, too, would require consideration of evidence that was unique to the plaintiff, such as evidence about what the plaintiff was told about the double haircut and when.  Trying the claims of even one member of the class would be difficult and time-consuming; trying the claims of all 10,000 members of the class in one lawsuit would be impossible.  Plaintiffs' motion for class certification is therefore denied.

### III.  JURISDICTION OVER PLAINTIFFS' INDIVIDUAL CLAIMS

The denial of plaintiffs' motion for class certification raises the issue of the Court's subject-matter jurisdiction over plaintiffs' individual claims.  Although plaintiffs allege that the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332, that is plainly not true (assuming, as seems to be the case, that plaintiffs mean to invoke § 1332(a)).

There is no jurisdiction over this case under § 1331, the federal-question statute, because plaintiffs' claims all arise under state law.  The only federal law relevant to this action is the Declaratory Judgment Act, and it is well settled that the Act is not an independent basis for jurisdiction.  *Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.*, 977 F.2d 1224, 1227 (8th Cir. 1992).

Likewise, there is no jurisdiction over this case under § 1332(a), the diversity-jurisdiction statute.  Neither plaintiff has alleged that his individual claims exceed $75,000, the amount in controversy required by § 1332(a).  Plaintiffs also seek declaratory relief, but, for purposes of determining the amount in controversy, the value of declaratory relief is measured by the value

of the object of the litigation.  *James Neff Kramper Family Farm P'ship v. IBP, Inc.*, 393 F.3d

828, 833 (8th Cir. 2005).  Here, the object of the litigation is the commissions that Ameriprise

allegedly owes to plaintiffs — commissions that, as noted, are not alleged to exceed $75,000 per

plaintiff.[12]

In reality, then, the only possible basis for federal jurisdiction over the individual claims

of Good and Miller is CAFA.[13]  CAFA is codified at 28 U.S.C. § 1332(d), which states (in

relevant part):

> The district courts shall have original jurisdiction of any civil
> action in which the matter in controversy exceeds the sum or value
> of $5,000,000, exclusive of interest and costs, and is a class action
> in which . . . any member of a class of plaintiffs is a citizen of a
> State different from any defendant[.]

28 U.S.C. § 1332(d)(2).  For purposes of determining whether the $5 million amount-in-

controversy requirement is met, the claims of individual class members are aggregated.  *Id.*

§ 1332(d)(6).  Now that the Court has denied class certification, however, there are no class

---

[12] Even if the Court had granted plaintiffs' motion for class certification, the Court would lack § 1332(a) jurisdiction over this case.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005) (courts may exercise supplemental jurisdiction over class members' claims, but only if at least one named plaintiff satisfies the amount-in-controversy requirement); *Kessler v. Nat'l Enters., Inc.*, 347 F.3d 1076, 1078-80 (8th Cir. 2003) (individual class members' distinct claims for contractual damages cannot be aggregated to satisfy § 1332(a)'s amount-in-controversy requirement).

[13] In ¶ 5 of their complaint, plaintiffs allege that "[t]his Court also has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1711.  This class action is between citizens of different states and the amount in controversy exceeds $5,000,000.00, exclusive of interest, costs or any claims by Defendants."  Section 1711, although a part of CAFA, does not have anything to do with subject-matter jurisdiction.  Obviously, from their reference to the amount in controversy, plaintiffs mean to invoke 28 U.S.C. § 1332(d).

claims to aggregate, and thus the question arises whether the Court has jurisdiction over Good's and Miller's individual claims under CAFA.

The handful of courts to address this issue have come to different conclusions. *Compare Genenbacher v. CenturyTel Fiber Co. II, LLC*, 500 F. Supp. 2d 1014, 1017 (C.D. Ill. 2007) (denial of class certification does not destroy CAFA jurisdiction), *In re Welding Fume Prods. Liability Litig.*, 245 F.R.D. 279, 317 & n.195 (N.D. Ohio 2007) (assuming, without deciding, that denial of class certification did not destroy CAFA jurisdiction), *Colomar v. Mercy Hosp., Inc.*, No. 05-22409, 2007 WL 2083562, at *2-3 (S.D. Fla. July 20, 2007) (denial of class certification and dismissal of only non-diverse defendant did not destroy CAFA jurisdiction), *and Davis v. Homecomings Fin.*, No. C05-1466RSL, 2007 WL 905939, at *1 (W.D. Wash. Mar. 22, 2007) (certification of a smaller class than originally requested, resulting in an amount in controversy of less than $5 million, did not deprive the court of CAFA jurisdiction), *with Falcon v. Philips Elecs. N. Am. Corp.*, 489 F. Supp. 2d 367, 368-69 (S.D.N.Y. 2007) (denial of class certification deprives the court of CAFA jurisdiction when the denial is premised on a basis that precludes even the reasonably foreseeable possibility of class certification in the future), *Hoffer v. Cooper Wiring Devices, Inc.*, No. 06-0763, 2007 WL 2891401, at *1-2 (N.D. Ohio Sept. 28, 2007) (following *Falcon*), *Arabian v. Sony Elecs. Inc.*, No. 05-1741, 2007 WL 2701340, at *5 (S.D. Cal. Sept. 13, 2007) (following *Falcon*), *Gonzalez v. Pepsico, Inc.*, No. 06-2163, 2007 WL 1100204, at *4 (D. Kan. Apr. 11, 2007) (assuming, without deciding, that denial of class certification destroys CAFA jurisdiction), *and McGaughey v. Treistman*, No. 05-7069, 2007 WL 24935, at *3 (S.D.N.Y. Jan. 4, 2007) (denial of class certification destroyed CAFA jurisdiction). Other decisions, while not directly on point, suggest that district courts retain jurisdiction over

the individual claims of the putative class representatives even after denying class certification in CAFA cases.  *See, e.g.*, *Miedema v. Maytag Corp.*, 450 F.3d 1322, 1331 (11th Cir. 2006) (noting, in a CAFA case, that jurisdictional facts are assessed on the basis of the complaint at the time of removal); *Garcia v. Boyar & Miller, P.C.*, No. 06-1936 et al., 2007 WL 1556961, at *5 (N.D. Tex. May 30, 2007) (plaintiffs' withdrawal of request for class certification did not destroy removal jurisdiction under CAFA).

Given that the effect of a denial of class certification on CAFA jurisdiction is a new and evolving legal issue, the Court will invite the parties to submit supplemental briefs addressing the question.  The Court recognizes, however, that if it ultimately finds that it has jurisdiction, that would immediately raise the question of whether Good and Miller should be ordered to arbitrate their claims.  It appears to the Court that such an order would likely be required. Whatever the other terms of their contracts with Ameriprise, Good and Miller were at all times parties to a written agreement that included an arbitration clause.  Earlier the Court declined to compel Good and Miller to arbitrate because of a NASD rule that prohibited Ameriprise from seeking to enforce arbitration agreements with respect to claims that are part of a class action. But that rule applies only until class certification is denied.  It would appear, then, that even if this Court finds that it continues to have jurisdiction over Good's and Miller's individual claims, the Court will have to order those claims to be arbitrated.

At this point, the Court will proceed as follows:

First, unless the parties reach a voluntary resolution of this matter (such as by agreeing to submit their dispute to arbitration), the parties should file supplemental briefs addressing two questions:  (1) Given that the sole basis for federal jurisdiction over this case was CAFA, and

given that the Court has determined that this case will not proceed as a class action, does the Court continue to have subject-matter jurisdiction over plaintiffs' individual claims?  (2) If the Court does continue to have subject-matter jurisdiction over plaintiffs' individual claims, must the Court order plaintiffs to arbitrate those claims?  Each party should file one brief, limited to 8,000 words, by Tuesday, February 19, 2008.  The parties need not describe the facts, as the Court is obviously familiar with the case.  Also, the parties should not reargue any issues that have already been decided by the Court.  The parties should contact the Court's calendar clerk to schedule oral argument on these issues for late February or early March.

Second, because the Court's jurisdiction seems doubtful, the Court will deny without prejudice Ameriprise's motion for judgment on the pleadings or, in the alternative, summary judgment.  If, after further briefing and argument, the Court concludes both (1) that it continues to have jurisdiction over plaintiffs' claims and (2) that plaintiffs are not required to arbitrate those claims, Ameriprise may renew its summary-judgment motion at that time.  Should Ameriprise do so, neither side will have to file additional papers or participate in additional argument; instead, the Court will decide the renewed motion on the briefs and record before it.

ORDER

Based on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' motion for class certification [Docket No. 52] is DENIED.

2. If the parties are unable to agree on a voluntary resolution of this case, they must submit supplemental briefs in compliance with the instructions given in the body of this Order.

-32-

3.      Defendants' motion for judgment on the pleadings and/or summary judgment

        [Docket No. 65] is DENIED WITHOUT PREJUDICE.  It may be renewed as

        described in the body of this Order.


Dated: January 18, 2008                         s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge